*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re WALKER, Minors.

UNPUBLISHED
February 17, 2022

Nos. 357704; 357731
Branch Circuit Court
Family Division
LC No. 19-005899-NA

Before: BOONSTRA, P.J., and RONAYNE KRAUSE and CAMERON, JJ.

PER CURIAM.

In these consolidated appeals, respondents appeal the trial court's order terminating their parental rights to their minor children, KW, HW, and RW. In Docket No. 357731, respondent-mother's parental rights were terminated under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care and custody), and (j) (reasonable likelihood that the children will be harmed if returned to the parent). In Docket No. 357704, respondent-father's parental rights were terminated under MCL 712A.19b(3)(c)(*i*) and (h) (parent imprisoned for such a period that the children will be deprived of a normal home for a period exceeding two years). We affirm in both dockets.

## I. BACKGROUND

This matter began when a petition was filed in July 2019. In relevant part, the petition alleged that respondent-mother was abusing substances and was unable to effectively parent the children as a result. It was also alleged that respondent-father had been convicted of assault with intent to commit sexual conduct, MCL 750.520g, and third-degree criminal sexual conduct, MCL 750.520d(1)(b) (force or coercion). At the time the petition was filed, respondent-father was incarcerated, and his earliest release date was October 26, 2022. It was alleged that respondent-father was unable to financially provide for the children. The petition requested that the trial court exercise jurisdiction. It was not requested that the children be removed from respondent-mother's care.

A preliminary hearing was held on July 18, 2019, and testimony supported that respondent-mother was medically neglecting KW, who has Type 1 Diabetes, and that respondent-mother's boyfriend had physically assaulted RW. Testimony also supported that respondent-mother was uncooperative with the caseworkers and refused to submit to a substance abuse screening. The

-1-

petition was authorized, and it was ordered that the children be placed in foster care. KW and HW were placed with a maternal great aunt, and RW was placed with fictive kin.[1] Respondent-mother was granted supervised parenting time.

In August 2019, respondents pleaded to several allegations in the petition. The trial court exercised jurisdiction and ordered that reasonable efforts toward reunification be made. The initial dispositional hearing was held in September 2019. Respondent-mother was ordered to comply with the case service plan, which required her to submit to psychological and substance abuse assessments and to comply with and benefit from (1) parenting classes, (2) mental health therapy, and (3) services to address substance abuse, including submitting to random drug screenings. Respondent-mother was also ordered to attend parenting time. Respondent-father was instructed to complete services that were available to him in prison.

Respondent-mother failed to maintain her sobriety and failed to comply with and benefit from the services. After July 3, 2020, respondent-mother stopped attending visitations with the children and stopped contacting the caseworkers. On August 28, 2020, respondent-mother entered a 30-day inpatient treatment program at Freedom Recovery Center. Respondent-mother left treatment against medical advice after seven days, and her visitations with the children were later suspended.

On September 28, 2020, petitioner filed a supplemental petition, requesting termination of respondents' parental rights. In October 2020, respondent-mother began participating in outpatient treatment. The termination hearing was scheduled to commence on October 30, 2020. However, because respondent-mother had retained new counsel, the termination hearing was adjourned to December 4, 2020, at which point respondent-mother reported that she could not be present in person because she had been exposed to COVID-19. The trial court again adjourned the hearing. On December 12, 2020, respondent-mother ingested methamphetamines.

When the termination hearing began on December 18, 2020, the trial court heard testimony from an employee at KW's school, from KW's counselor, and from the director of the Freedom Recovery Center. According to the director, respondent-mother had contacted him earlier that month and expressed a desire to return to inpatient treatment. However, respondent-mother had failed to call at the scheduled time for the "phone intake" and had not contacted him since. Because additional testimony needed to be heard, the trial court continued the termination hearing to January 15, 2021.

On December 23, 2020, respondent-mother tested positive for methamphetamines. In January 2021, respondent-mother submitted to an evaluation through her outpatient treatment program. Respondent-mother was not present at the January 15, 2021 termination hearing. Respondent-mother's attorney reported that respondent-mother had been diagnosed with post-traumatic stress disorder, depression, and "severe anxiety" and that she had begun taking psychotropic medication. Counsel for respondent-mother moved to adjourn the hearing, and the

---

[1] RW was placed with the mother of respondent-father's oldest child and her husband. The children's half-brother also lived in the home.

trial court granted the motion. The termination hearing was scheduled to resume on February 5, 2021.

On February 2, 2021, respondent-mother evaded the caseworker, who wanted respondent-mother to submit to a substance screening. On the morning of the February 5, 2021 hearing, respondent-mother's counsel reported that the children's maternal grandmother had been hospitalized and that respondent-mother could not attend the hearing. The trial court again adjourned the termination hearing with respect to respondent-mother, but heard proofs with respect to respondent-father. Respondent-father, the children's parental grandmother, and one of the caseworkers testified. The trial court ordered respondent-mother to submit to a substance screening, and she tested positive for methamphetamines on February 15, 2021.

On February 26, 2021, the termination hearing resumed, and respondent-mother was present and provided testimony. Although respondent-mother testified that she was making progress in her recovery, she failed to submit to a court-ordered substance screening after the hearing concluded. Respondent-mother also failed to attend a March 4, 2021 review hearing and the April 16, 2021 continued termination hearing. Both hearings were adjourned.

On June 4, 2021, the final termination hearing commenced, and respondent-mother tested positive for amphetamines and methamphetamines. The trial court concluded that statutory grounds existed to support the termination of respondents' parental rights and that termination of respondents' parental rights was in the children's best interests. In so holding, the trial court considered the fact that KW and HW were placed with a relative and the fact that respondent-father wanted the children to be placed in a guardianship. The trial court concluded that termination was nonetheless in the best interests of the children because they required permanency and stability. These appeals followed.

## II. ANALYSIS

### A. BOTH DOCKETS—STATUTORY GROUNDS

Respondents argue that the trial court clearly erred by finding clear and convincing evidence supporting the statutory grounds cited in support of termination. We find no clear error warranting reversal.

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). "We review the trial court's determination for clear error." *Id*. "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made," with the reviewing court "defer[ring] to the special ability of the trial court to judge the credibility of witnesses." *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014).

We conclude that the trial court did not clearly err by finding that grounds for terminating respondents' parental rights were established under MCL 712A.19b(3)(c)(*i*), which provides the following:

> (c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

> (*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

In this case, at the time of termination, more than 182 days had "elapsed since the issuance of [the] initial dispositional order" with respect to respondents. See MCL 712A.19b(3)(c). Additionally, for the following reasons, we conclude that respondents both failed to rectify the issues that lead to adjudication.

The children were removed from respondent-mother's care on July 18, 2019, in part, because of her issues with substance abuse. In July 2019, respondent-mother tested positive for substances three times. From August 2019 through October 2019, respondent-mother refused to submit to substance screenings. Thereafter, respondent-mother tested positive for THC and methamphetamines before scheduled parenting times. Respondent-mother also failed to consistently attend individual therapy and therefore did not make progress in her substance abuse treatment. In July 2020, respondent-mother stopped visiting the children and stopped communicating with caseworkers because she was "self medicating" and because she "just gave up" and "didn't care[.]"

Despite efforts on the part of the caseworkers, respondent-mother did not enter inpatient treatment until August 28, 2020. Respondent-mother left inpatient treatment seven days later despite being warned by staff that leaving treatment 23 days early could impact her ability to reunite with the children and could impact her ability to "get back into treatment" in the future because of insurance reasons. Respondent-mother was also warned that, if she relapsed and consumed methamphetamines again, she could die. Nonetheless, respondent-mother indicated that she was "struggling" and "didn't want to be in treatment anymore." Respondent-mother relapsed after prematurely leaving inpatient treatment.

Respondent-mother began attending outpatient treatment in October 2020, but she missed a majority of her therapy sessions and ingested substances after the termination hearing commenced in December 2020. Although respondent-mother began consistently attending outpatient treatment in January 2021, on February 2, 2021, respondent-mother evaded a caseworker who wanted respondent-mother to submit to a substance screening. Respondent-mother tested positive for methamphetamines on February 15, 2021. Respondent-mother admitted that she used methamphetamines again "a couple of days" later and that she was living with a man whose parental rights had been terminated as a result of his substance abuse.

While respondent-mother believed at the time of the February 26, 2021 termination hearing that she was making significant progress and that she would be ready to regain custody of the

children within one month, respondent-mother failed to submit to a court-ordered drug screening after that hearing. Respondent-mother also tested positive for amphetamines and methamphetamines on June 4, 2021, which was the final day of the termination hearing. Thus, the totality of the evidence amply supports that respondent-mother had not accomplished any meaningful change in the condition that led to adjudication despite being offered services. See *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009).

Furthermore, the record does not support that respondent-mother would be able to rectify her issues within a reasonable time considering the children's ages. See MCL 712A.19b(3)(c)(*i*). Respondent-mother was either unable or unwilling to maintain sobriety during the proceeding, and she refused to take accountability for the fact that the children had remained in care in large part because of her substance abuse. Indeed, when questioned about it at the February 26, 2021 hearing, respondent-mother indicated that she did not "want to talk about that" and that she did not "need to explain [her]self." While the director of Freedom Recovery believed that respondent-mother could be "very successful" if she followed treatment recommendations, he noted that respondent-mother was "really deep in an addiction that ha[d] control over almost everything in her life[.]" The director believed that respondent-mother would require "years" of treatment given the seriousness of her addiction.

At the time of termination, KW was 12 years old, HW was six years old, and RW was 34 months old. The children had been out of respondent-mother's care for more than 22 months and had not seen her for 11 months. The children needed permanency and stability and could not wait an indefinite amount of time for respondent-mother to improve. See, e.g., *In re Dahms*, 187 Mich App 644, 647-648; 468 NW2d 315 (1991) (holding that, because the Legislature did not intend for children to be left in foster care indefinitely, it is proper to focus on how long it will take a respondent to improve and on how long the involved children can wait). We therefore conclude that the trial court's finding that termination of respondent-mother's parental rights was proper under MCL 712A.19b(3)(c)(*i*) was not clearly erroneous. Because termination was proper under (c)(*i*), this Court need not specifically consider the additional grounds upon which the trial court based its decision. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009).[2]

With respect to respondent-father, the record does not support that he had rectified the issue that led to adjudication, i.e., his inability to provide proper care and custody to the children. See MCL 712A.19b(3)(c)(*i*).[3] Respondent-father had not been actively involved in the children's lives since being imprisoned in July 2018 for two crimes involving sexual assault. Respondent-father continued to be incarcerated throughout the lengthy proceeding and did not provide financial support to the children. Indeed, respondent-father testified at the February 5, 2021 termination

---

[2] To the extent that we have considered the additional grounds, we conclude that termination was also proper under MCL 712A.19b(3)(g) and (j).

[3] Respondent-father argues that "[b]ecause every element of a termination criterion must be proven, if every element of MCL 712A.19b(3)(h) isn't proven, then the elements of MCL 712A.19b(3)(c)(i) can't be proven." However, this argument is unsupported by relevant authority and is entirely inconsistent with the statutory language.

hearing, "I went to prison. What do you expect me to do[?]" While respondent-father attempted to provide emotional support to the children by sending them letters and by engaging in telephone conversations with them, KW expressed a desire to be adopted and RW was not bonded to respondent-father because of her limited contact with him throughout her life.

Although respondent-father could have provided for the children's care and custody during the proceeding "by voluntarily granting legal custody to his relatives during [the] remaining term of [his] incarceration," *In re Mason*, 486 Mich 142, 163; 782 NW2d 747 (2010), respondent-father only initially expressed an interest in granting legal custody to his mother, who was unable to provide appropriate care.[4] While respondent-father indicated at the final termination hearing that he was willing to grant legal custody to his great aunt or to the mother of his oldest son, there is no indication that they were willing to agree to that arrangement. Moreover, testimony supported that a guardianship would have been inappropriate given the ages of the children and their need for permanency. Thus, the totality of the evidence amply supports that respondent-father had not accomplished any meaningful change in the condition that led to adjudication. See *In re Williams*, 286 Mich App at 272.

Furthermore, the record clearly establishes that there was no reasonable likelihood that the condition that led to adjudication would "be rectified within a reasonable time considering the child[ren]'s age[s]." See MCL 712A.19b(3)(c)(*i*). The earliest that respondent-father would be released from prison was October 2022; his maximum release date was October 2032. Respondent-father testified that he planned to live with his mother until he was able to save enough money to locate independent housing after he was released from prison. The children, who had been in care for 22 months, required consistency, permanency, and stability and could not wait an indefinite amount of time for respondent-father to be able to provide them with proper care and custody. See, e.g., *In re Dahms*, 187 Mich App at 647-648. The trial court's finding that termination was proper pursuant to MCL 712A.19b(3)(c)(*i*) does not leave us with a definite and firm conviction that a mistake has been made. Because we have concluded that at least one ground for termination existed, we need not consider the additional ground upon which the trial court based its decision. See *In re HRC*, 286 Mich App at 461.

## B. RESPONDENT-MOTHER (DOCKET NO. 357731)—BEST INTERESTS

Respondent-mother next argues that the trial court erred by finding that termination of her parental rights was in the children's best interests. We disagree.

"The trial court must order the parent's rights terminated if the Department has established a statutory ground for termination by clear and convincing evidence and it finds from a preponderance of the evidence on the whole record that termination is in the children's best

---

[4] Although testimony supported that the children were bonded with their maternal grandmother, testimony also supported that she did not have adequate housing because she did not have running water. Additionally, there were concerns that the maternal grandmother would not "follow the case service plan" and did not take KW's diabetes seriously.

interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). We review the trial court's best-interest determination for clear error. *Id*.

This Court focuses on *the children*—not the parent—when reviewing best interests. *In re Trejo Minors*, 462 Mich 341, 356; 612 NW2d 407 (2000). "In making its best-interest determination, the trial court may consider the whole record, including evidence introduced by any party." *In re Medina*, 317 Mich App 219, 237; 894 NW2d 653 (2016) (quotation marks and citation omitted).

> [T]he court should consider a wide variety of factors that may include the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption. [*In re White*, 303 Mich App at 713-714 (quotation marks and citation omitted).]

While the record supports that respondent-mother and KW were bonded, the record also supports that the bond was not healthy for KW. Indeed, the children were taken into care in part because respondent-mother was medically neglecting KW, who has Type 1 Diabetes and who had abscesses in his mouth. Additionally, respondent-mother had failed to ensure that KW attended school in a consistent and timely manner. Indeed, when in respondent-mother's care, KW missed 90 days of school in one school year. After KW was taken into care, his diabetes was more appropriately managed, and his school attendance dramatically improved. Respondent-mother did not attend KW's medical appointments during the proceeding, and a caseworker testified that respondent-mother had never recognized the impact that her failure to manage KW's diabetes had on him. Indeed, although it was noted at the beginning of the proceeding that KW's growth was "substantially stunted" because of respondent-mother's failure to manage his disease, respondent-mother brought candy to KW's school during the proceeding.

Although KW loved respondent-mother, KW expressed anger toward her for failing to care for him and expressed resentment that he was often responsible for caring for his younger siblings while he was in her care. KW also refused to speak with or see respondent-mother in December 2020, and KW repeatedly expressed that he wanted to be adopted. Although respondent-mother heard testimony on December 18, 2020, that KW was having mental health issues and that he wanted the proceeding to "be over," the termination hearing was adjourned three additional times because of respondent-mother's failure to appear.

When respondent-mother testified on February 26, 2021, she failed to recognize that her actions had contributed to KW's mental health struggles, and she indicated that it would not "harm [the children] at all to give their mom a little bit of extra time." Although respondent-mother had not seen or spoken to KW in more than seven months as a result of her own actions, she indicated that she knew her children "more than anybody" and referred to KW's expressed desire to be adopted as "nonsense" and untrue. Thus, while respondent-mother shared a bond with KW at the time of termination, the record supports that the bond was not healthy for KW. See *In re CR*, 250 Mich App 185, 196-197; 646 NW2d 506 (2002), overruled on other grounds by *In re Sanders*, 495

Mich 394 (2014) (holding that the fact that there was a "serious dispute" on the record concerning whether the respondent had "a healthy bond" with her children supported that termination of her parental rights was in the children's best interests).

With respect to HW and RW, HW was 4-1/2 years old when he was taken into care. RW was 12 months old when she was taken into care. Respondent-mother admitted that she was under the influence of methamphetamines during visitations with the children, and respondent-mother had never had unsupervised visitation. In July 2020, respondent-mother stopped attending visitation, and her parenting time was suspended in October 2020 and was never reinstated. Thus, at the time of termination HW and RW had not seen respondent-mother for 11 months. The record simply does not support that HW and RW were bonded with respondent-mother.

Additionally, as discussed above, respondent-mother demonstrated an inability or an unwillingness to maintain her sobriety during the proceeding. Indeed, respondent-mother acknowledged that the longest she had stayed sober was two weeks. Meanwhile, the children were doing well in their placements. KW and HW were both placed with their paternal great aunt, who had demonstrated an ability and willingness to provide for their needs and had expressed a desire to adopt them. KW, who desperately needed permanency, wanted to be adopted by his great aunt. RW was bonded with her fictive kin caregivers and called them "mom" and "dad." RW's caregivers provided her with the stability and permanency that she required, and they were interested in adopting her. Importantly, the children's great aunt and RW's caregivers lived four miles away from each other and were invested in ensuring that the children maintained their sibling bond. For these reasons, we conclude that the trial court did not clearly err by finding that termination of respondent-mother's parental rights was in the children's best interests.

Affirmed in both dockets.

/s/ Mark T. Boonstra
/s/ Amy Ronayne Krause
/s/ Thomas C. Cameron